## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KARIM ROSARIO RIVERA,** | : | **Civil No. 1:21-CV-1269** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.      Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Karim Rivera applied for supplemental security income under Title XVI of the Social Security Act on September 11, 2019, alleging an onset date of disability of August 16, 2019. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Rivera was not disabled during the relevant period and denied her application for benefits. Rivera now appeals this decision, arguing that the ALJ's decision was not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

Rivera filed her claim for disability benefits on September 11, 2019, alleging an onset date of disability of August 16, 2019. (Tr. 27). Rivera alleged disability due to the following impairments: acquired hypothyroidism, anxiety disorder, asthma, coronary artery disease, scoliosis, a history of non st elevation myocardial infarction, intervertebral disc disorder, lumbar facet arthropathy, lumbar radiculopathy, major

2

depressive disorder, polymyalgia, sciatic pain, depression, PTSD, and kidney stones. (Tr. 90-91). She was 42 years old at the time of her disability application, had a high school education, and had no past relevant work experience. (Tr. 36).

With respect to Rivera's impairments, the medical record revealed the following: regarding her physical impairments, just prior to the alleged onset date of disability in June of 2019, Rivera complained of pain all over her body, and she was diagnosed with pyelonephritis, iron deficiency anemia, acquired hypothyroidism, and arthralgia. (Tr. 1282). She expressed concerns regarding fatigue and joint pain, but on examination she exhibited normal musculoskeletal range of motion and no edema or deformity. (Tr. 1283-85). At a follow up appointment in July, Rivera continued to complain of pain but reported that her pain was slightly improved with medication. (Tr. 1264).

Treatment notes from August of 2019 indicate that Rivera also experienced chest pains and shortness of breath, and she was diagnosed with moderate asthma without complication. (Tr. 1233). She was noted to have a chronic dry cough and shortness of breath with activity, which was relieved by a rescue inhaler. (Tr. 1235). It was further noted that Rivera smoked cigarettes daily. (Id.) At a visit later in August, Rivera was diagnosed with discogenic syndrome, lumbar; lumbar radiculopathy; and back strain. (Tr. 1505). She complained of pain radiating from

her back to her legs, and it was noted that she had previously completed physical therapy with some relief. (Id.) These treatment notes also indicate that Rivera continued to work part time as a cashier at this time. (Tr. 1506). On examination, she exhibited tenderness but no muscle spasms or guarded range of motion; she experienced no radicular pain, and her straight leg raise testing was negative bilaterally. (Tr. 1507).

At a visit in October of 2019, Rivera reported that she was living in a shelter, and that she was trying to work at General Mills but was having a hard time standing for long periods of time due to back pain and fatigue. (Tr. 1215). It was also noted that she had a history of anemia. (Id.) Later in October, Rivera presented to the emergency room complaining of flank pain. (Tr. 1410). Her history of high blood pressure was noted, and she admitted that she did not take her medication. (Id.) Rivera was seen again at the emergency room in December complaining of chest pains. (Tr. 1606). She was admitted, and it was recommended that she have a cardiac catheterization, but she declined and left the hospital due to concerns for her daughter's care. (Id.)

In January of 2020, Rivera underwent an internal medicine examination with Dr. Ahmed Kneifati, M.D. (Tr. 1318-22). Dr. Kneifati noted her history of hypertension, asthma, hypothyroidism, scoliosis, and heart attack. (Tr. 1318). Rivera

4

reported cooking and doing laundry once per week; cleaning twice per week; showering and dressing as needed; and watching television and listening to the radio. (Tr. 1319). On examination, Rivera exhibited a normal gait and stance; could walk on her heels and toes without difficulty; needed no help on and off the examination table; and her squat was limited to 50%. (Tr. 1320). She exhibited 5/5 strength in her upper and lower extremities, a negative straight leg raise test in the sitting position, tenderness in the lumbar area, no evident joint deformity, and stable joints. (Tr. 1321). Dr. Kneifati opined that Rivera could occasionally lift and carry up to 10 pounds; could sit for 4 hours, stand for 3 hours, and walk for 2 hours in an 8-hour workday; and could occasionally climb, balance, and stoop and frequently kneel, crouch, and crawl. (Tr. 1324-26).

Rivera followed up at Penn State Milton Hershey Medical Center in January of 2020 for fibromyalgia and lupus. (Tr 1341). It was noted that she was last seen over a year prior, and she had run out of her medication. (Id.) She complained of pain in her legs and hands but admitted that she had not taken any over the counter medication. (Id.) It was noted that she had tried aqua therapy, but it had made the pain worse. (Id.) On examination, she exhibited slight tenderness, good range of motion, no swelling in her knees but pain with range of motion, and tenderness in

her foot. (Tr. 1342). She was given a prescription for Flexeril and advised to follow up regarding her lupus. (Id.)

In May of 2020, Rivera called her physician because she was not feeling well, and she was advised to go into the office. (Tr. 1377). She was then advised to go to the emergency room because of her high blood pressure and history of heart disease. (Id.) In August, lab results indicated that Rivera was anemic and she was started on iron. (Tr. 1384). Around this time, treatment notes from her primary care doctor indicate that Rivera was complaining of weakness. (Tr. 1373). On examination, her extremities were unremarkable, she had a normal gait and no focal neurological deficits, and she was assessed with generalized weakness and advised to drink plenty of liquids. (Id.)

Treatment notes from Wellspan Orthopedics in September of 2020 stated that Rivera had not been seen at that practice in a year for her back pain, and that she was complaining of increased pain in her lower back and left leg. (Tr. 1505-06). These notes also indicated that Rivera was continuing to work as a cashier despite her complaints of pain. (Tr. 1506). Around this same time, Rivera followed up with cardiology for her coronary artery disease. (Tr. 1487). She reported episodes of sharp, stabbing chest pains, and she noted that it was more noticeable while she was working, specifically when she was lifting and carrying heavy packages. (Id.) She

further conceded that she was not consistent with her medication regimen, and she was significantly hypertensive with systolic blood pressure readings. (Id.) Rivera also followed up for her back pain in later in September, and it was noted that she did not go to physical therapy and did not get her back brace. (Tr. 1503). On examination, Rivera had good posture and was not limping, her straight leg raise test was positive, and she had no muscle atrophy or weakness of the knees. (Tr. 1504).

Rivera followed up with her family medical provider in October, reporting that her weakness had not improved. (Tr. 1549). She further reported that she had not been taking her iron pills for her anemia. (Id.) On examination, she had full strength in her lower extremities, no weakness, and a normal gait. (Tr. 1550). In November, Rivera was seen at the emergency room for a mass on her left thigh, which she thought could be due to her lupus. (Tr. 1591). She exhibited normal musculoskeletal range of motion, and while there was tenderness present, there was no swelling, deformity, or signs of injury. (Tr. 1595).

With respect to her mental and emotional impairments, treatment notes from July of 2019 noted Rivera's worsening symptoms of anxiety. (Tr. 1264). She requested refills of her psychiatric medications. (Id.) She was noted to be nervous and anxious, but she had a normal mood and affect, and her behavior was noted to be normal. (Tr. 1265-66). In September of 2019, at an emergency room visit, Rivera

7

reported that she was out of her psychiatric medications because she had missed an appointment with her psychiatrist. (Tr. 1660). At this time, she admitted that she was noncompliant with her medication because she "does not feel like taking [her] medications when [she] is depressed." (Id.) On examination, she exhibited a depressed mood, but her behavior was normal, she was not actively hallucinating, and she had no suicidal or homicidal ideation. (Tr. 1665).

Rivera resumed treatment with her therapist and psychiatrist in October of 2019. (Tr. 1354). She reported daily symptoms, ranging from moderate to severe, of depression, hopelessness, anxiety, panic attacks, mood swings, and hallucinations. (Id.) Treatment notes from November indicate that Rivera had a "very depressed" mood, she was moderately anxious and very tearful, and she reported auditory hallucinations. (Tr. 1364). Her judgment and insight were fair on examination, as were her cognition and memory. (Id.) In January of 2020, Rivera reported that she was compliant with her medications but continued to experience auditory and visual hallucinations. (Tr. 1361). On examination, she was cooperative and less anxious compared to her pervious visit; she had a depressed mood; and her judgment and insight were fair. (Tr. 1361-62).

Around this time, Rivera underwent a mental status evaluation with Dr. Kathleen Ledermann, Psy.D. (Tr. 1299-1304). Dr. Ledermann noted that Rivera's

speech was fluent and clear; her thought processes were coherent and goal-directed with no evidence of hallucinations; she had a sad and tired mood; she had intact attention and concentration; and her insight and judgment were fair to good. (Tr. 1302-03). Dr. Ledermann opined that Rivera had none to mild limitations in understanding, remembering, and carrying out instructions; no limitations in interacting with others; and that Rivera's ability to concentrate, persist, and maintain pace was affected by her hallucinations. (Tr. 1305-06).

In February, Rivera reported that she was feeling better with respect to her hallucinations since her medication was increased. (Tr. 1358). She also reported a reduced frequency in nightmares and flashbacks. (Id.) At a visit with her primary care provider in August of 2020, Rivera's mental status examination was noted to be normal. (Tr. 1373).

It is against this medical backdrop that the ALJ held a telephonic hearing on Rivera's claim on February 10, 2021, at which Rivera and a vocational expert testified. (Tr. 43-61). Rivera testified that during the relevant period, she experienced pain that radiated from her back into her legs. (Tr. 46). She stated that the pain made it difficult for her to bend down, walk for more than five minutes, and sit for extended periods of time. (Tr. 46-47). She testified that she took Gabapentin for the pain and that laying down helped. (Tr. 47). Rivera further testified that she

experienced pain and tingling in her hands, fingers, and feet, and that she had tried aqua therapy, but it made the pain worse. (Tr. 48). Rivera also noted that she experienced fatigue and suffered from anemia. (Tr. 53). However, Rivera stated that during the relevant time period, and continuing through the time of the hearing, she worked as a cashier part time, working 20 to 24 hours per week. (Tr. 49, 54). Regarding her mental and emotional impairments, Rivera reported that she was always depressed and wanted to be isolated, and that she experienced panic attacks almost every night. (Tr. 50). She stated that she had problems with anger and dealing with people, and that she had issues with her concentration. (Tr. 51). Rivera reported being able to do some household chores, such as cleaning, laundry, and taking out the trash with some help from her daughter. (Tr. 52-53).

Ultimately, the ALJ denied Rivera's claim for benefits. (Tr. 27-37). In that decision, the ALJ first concluded that Rivera had not engaged in any substantial gainful activity since the date of her application. (Tr. 29). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Rivera had the following severe impairments: coronary artery disease, hypertension, degenerative disc disease, obesity, major depressive disorder, PTSD, and generalized anxiety disorder. (Id.) At Step 3, the ALJ determined that Rivera did not have an impairment or combination of impairments that meets or medically equals the severity of one of

10

the listed impairments. (Tr. 29-31). With respect to her mental impairments, the ALJ found that Rivera was moderately limited in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; adapting or managing oneself; and interacting with others. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Rivera's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can stand and/or walk for up to four (4) hours in an eight (8) hour workday, can engage in occasional climbing of ramps, stairs, ladders, ropes, or scaffolds, balancing, stooping, kneeling, crouching, and crawling, and retains the capacity to perform simple and routine tasks, involving only simple, work-related decisions, with few, if any, work place changes, no production pace work, and can engage in only occasional interaction with supervisors, co-workers, and the public.

(Tr. 31).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Rivera's testimony regarding her impairments. On this score, regarding Rivera's mental impairments, the ALJ considered the opinions of the state agency consultants, Dr. Marci Cloutier and Dr. Richard Williams, who opined in January and September of 2020 that Rivera was only moderately limited in the four broad areas of functioning and retained the ability to perform simple, routine tasks. (Tr. 34). The ALJ found these opinions persuasive

11

because they were supported by objective examination findings and were consistent with the claimant's reported activities of daily living. (Id.) The ALJ also considered Dr. Ledermann's opinion, which found that Rivera had none to only mild limitations in the areas of functioning and found it unpersuasive. (Tr. 35). The ALJ reasoned that this opinion was not consistent with the objective findings of impaired memory and concentration and was not limiting enough. (Id.)

Regarding her physical impairments, the ALJ considered the January 2020 opinion of Dr. Ahmed Kneifati, M.D., and found this opinion partially persuasive. (Tr. 34-35). Dr. Kneifati opined that Rivera could lift and carry up to 10 pounds occasionally but never any more than 10 pounds; had no manipulative limitations; could sit for 4 hours, stand for 3 hours, and walk for 2 hours in an 8-hour workday; could frequently kneel, crouch, and crawl and occasionally climb ramps, stairs, ladders, and scaffolds, balance, and stoop. (Tr. 1323-28). The ALJ found some of Dr. Kneifati's limitations to be consistent with the record, but with respect to the sitting limitation, the ALJ reasoned that this finding was inconsistent with objective notations of 5/5 strength in the lower extremities, along with treatment notes that suggested Rivera experienced less pain with resting. (Tr. 35). The ALJ further reasoned that this finding was inconsistent with Rivera's own reports that she cleaned and straightened up her home a few times per week. (Id.)

The ALJ also considered the opinion of the state agency medical consultants, Dr. Richard Surrusco and Dr. Glenda Cardillo, and found these opinions persuasive. (Tr. 34). These opinions found Rivera capable of performing light work, in that Rivera could stand and walk up to 4 hours and sit for 6 hours in an 8-hour workday, could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 101, 122). The ALJ reasoned that these opinions were consistent with objective findings during the relevant period of 5/5 strength in Rivera's lower extremities and negative straight leg raise tests, as well as with her reported activities of daily living. (Tr. 34).

The ALJ also considered Rivera's testimony but ultimately found that Rivera's complaints were not entirely consistent with the medical evidence of record. (Tr. 32-34). As for her physical impairments, the ALJ recognized some abnormal findings such as decreased range of motion and tenderness but also noted findings of a normal gait, negative straight leg raise tests, and no evidence of weakness in the lower extremities. (Tr. 32). The ALJ further noted the findings of high blood pressure in the record as well as treatment notes indicating that Rivera was not consistent with her medication regimen. (Tr. 33). The ALJ also accounted for Rivera's obesity but noted that there was little evidence in the record indicating any treatment for her obesity. (Id.) Further, the ALJ noted that Rivera's activities of daily living did not support a disabling level of impairment, in that she testified to

13

cleaning her home, preparing her own meals, and leaving the house, as well as her ability to perform personal care with minimal assistance. (Tr. 34).

As for her mental impairments, while the ALJ noted the abnormal findings in the record, such as a sad mood and impaired memory, he further noted that mental status examinations in the record were relatively benign. (Tr. 33). In addition, the ALJ reasoned that Rivera's mental impairments were managed with medication, which the record indicated was helpful in that her hallucinations were reduced, and she experienced reduced frequency of flashbacks and nightmares when she took her medication. (Tr. 33-34). Accordingly, the ALJ ultimately found that Rivera' complaints were not entirely consistent with the medical record.

Having arrived at this RFC assessment, the ALJ found at Step 4 that Rivera had no past relevant work but ultimately found at Step 5 that Rivera could perform work available in the national economy as a sorter, agricultural produce; assembler, electrical accessories; and bakery worker, conveyor line. (Tr. 36). Accordingly, the ALJ concluded that Rivera did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 37).

This appeal followed. (Doc. 1). On appeal, Rivera contends that the ALJ failed to include limitations from both her severe and nonsevere impairments. She further argues that the ALJ's treatment of Dr. Kneifati's opinion was in error. This case is

14

fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

**III.**   **Discussion**

**A.**      **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

<u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see,
> e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v.
> Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that she is not disabled is

supported by substantial evidence and was reached based upon a correct application

16

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

### B.   <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a

claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20

C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe

physical or mental impairment that makes it impossible to do his or her previous

work or any other substantial gainful activity that exists in the national economy.  42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for

his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in September of 2019 after a

paradigm shift in the manner in which medical opinions were evaluated when

assessing Social Security claims. Prior to March 2017, ALJs were required to follow

regulations which defined medical opinions narrowly and created a hierarchy of

medical source opinions with treating sources at the apex of this hierarchy. However,

in March of 2017, the Commissioner's regulations governing medical opinions

changed in a number of fundamental ways. The range of opinions that ALJs were

enjoined to consider were broadened substantially, and the approach to evaluating

opinions was changed from a hierarchical form of review to a more holistic analysis.

As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer

give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2),
416.920c(b)(2). However, where the ALJ has found two or more
medical opinions to be equally well supported and consistent with the
record, but not exactly the same, the ALJ must articulate how he or she
considered those factors contained in paragraphs (c)(3) through (c)(5).
Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." Chandler

v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d

Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without
crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);

25

> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); Connors v.
> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.   The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large

or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S.

at 565. Judged against these deferential standards of review, we find that substantial

evidence supported the decision by the ALJ that Rivera was not disabled. Therefore,

we will affirm this decision.

With respect to her claims regarding the treatment of opinion evidence, we first note that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

In the instant case, the plaintiff argues that the ALJ should have found Dr. Kneifati's opinion more persuasive, and that the ALJ erred in finding the opinions of the state agency consultants persuasive. However, we conclude that the ALJ properly discussed all of the relevant evidence in determining how persuasive he found these opinions. First, with respect to Dr. Kneifati's opinion, the ALJ explained that while the record supported some of Dr. Kneifati's limitations, the limitation regarding Rivera's ability to sit was not consistent with objective findings of 5/5 strength in her lower extremities and treatment notes indicating that her pain was better with resting. The ALJ also reasoned that this limitation was inconsistent with

27

Rivera's reported activities of daily living, which included cleaning and straightening up her house several times per week.

Instead, the ALJ found persuasive the opinions of the state agency consultants, who opined that Rivera could stand or walk for 4 hours and sit for 6 hours in an 8-hour workday. The ALJ reasoned that these opinions were consistent with and supported by findings in the record of 5/5 strength in all extremities, negative straight leg raise tests, and Rivera's reported activities of daily living. Indeed, the record is replete with normal musculoskeletal examination findings, including a normal gait, normal range of motion, and full strength in Rivera's extremities. Moreover, it is undisputed that Rivera was working part time during the relevant period, and she testified that she was permitted to sit for periods of time at her job to relieve her pain. Accordingly, we find that substantial evidence supports the ALJ's treatment of this opinion evidence.

We similarly conclude that the ALJ's treatment of the records pertaining to Rivera's mental impairments is supported by substantial evidence. On this score, the ALJ considered the opinion of the state agency consultants, who found that Rivera was moderately limited in the four broad areas of functioning and found these opinions persuasive. The ALJ reasoned that these opinions were consistent with findings of fair insight and judgment, impaired memory, and intact attention and

concentration. The ALJ also considered Dr. Ledermann's opinion but found this opinion unpersuasive and not limiting enough, given some of the abnormal mental status examination findings during the relevant period. Thus, finding that Rivera was moderately limited in the broad areas of functioning, the ALJ limited her to an RFC involving simple, routine tasks and simple work-related decisions, as well as few, if any, workplace changes and occasional interaction with others.

On this score, in Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals addressed the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In terms that are equally applicable here, the Court noted that "[t]he relationship between 'simple tasks' limitations and 'concentration, persistence, or pace' is a close one." Id. Given how closely related these two concepts are, the appellate court rejected the notion advanced by the plaintiff that an RFC which limited a claimant to simple tasks failed as a matter of law to address moderate limitations on concentration, persistence, and pace. Instead, the Court concluded that:

> A limitation to "simple tasks" is fundamentally the same as one "to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]" (App. at 33-34;) see Davis v. Berryhill, 743 F. App'x 846, 850 (9th Cir. 2018) (treating "understanding, remembering, and carrying out only simple instructions" as equivalent to "simple tasks"); Richards v. Colvin, 640

F. App'x 786, 790 (10th Cir. 2016) (referring to a limitation "to understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions" as a "simple-work limitation[ ]"). Indeed, both formulations — the ALJ's and the more concise phrase "simple tasks" — relate to mental abilities necessary to perform "unskilled work." See 20 C.F.R. §§ 404.1568(a), 416.968(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."); SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) (concluding that "unskilled work" requires "[u]nderstanding, remembering, and carrying out simple instructions" and "[m]aking ... simple work-related decisions"); cf. Richards, 640 F. App'x at 790 (treating "simple-work limitations" as similar to "unskilled work" limitations). So the parties' reliance on case law related to "simple tasks" is appropriate and helpful.

Hess, 931 F.3d at 210–11.

Having rejected a *per se* rule finding that simple task RFCs are legally inadequate to address moderate limitations in concentration, persistence, and pace, the Court of Appeals found that, in this setting, the issue was one of adequate articulation of the ALJ's rationale, holding that "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Id. at 211. On this score, the appellate court indicated that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the

claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]'" Id. at 214.

Accordingly, we conclude that substantial evidence supports the ALJ's treatment of this evidence and the limitation to simple, routine tasks given the finding that Rivera had moderate limitations in these areas of functioning. On this score, the ALJ was presented with several medical opinions, both in terms of the plaintiff's physical and mental impairments. Ultimately, the ALJ discussed the weight afforded to each, citing to the objective medical evidence that supported or did not support the opinions. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. The ALJ also considered Rivera' subjective complaints but found that they were inconsistent with the record as a whole. While Rivera contends that the ALJ failed to include limitations from her impairments, an ALJ is only obligated to include the claimant's credibly established limitations in the RFC. Rutherford, 399 F.3d at 554. Accordingly, we find that the ALJ considered all of the medical evidence and adequately explained his reasoning for the weight given to the various medical opinions in this case to determine the range of work Rivera could perform.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: August 1, 2023